**In re AMERICAN MORTGAGE & INVESTMENT SERVICES,**
Debtor.

**Bankruptcy No. 91–33386.**

United States Bankruptcy Court, D. New Jersey.

Sept. 9, 1993.

Kathryn Ferguson, Markowitz & Zindler, Lawrenceville, NJ, for plaintiff, Principal Asset Markets, Inc.

Allen I. Gorski, Teich, Groh & Frost, Trenton, NJ, for Trustee, Barry W. Frost.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

This matter comes before the court on an application for compensation by the brokerage firm of Principal Asset Markets, Inc. based on a contingency fee determined by a percentage of the principal balance. This court has jurisdiction under 28 U.S.C. § 1334, and it is a core matter as defined in 28 U.S.C. § 157(b)(2)(A).

### PROCEDURAL HISTORY AND STATEMENT OF FACTS

The debtor in this case, American Mortgage & Investment Services, filed a voluntary Chapter 7 bankruptcy petition in the District of New Jersey on June 14, 1991. Barry W. Frost, Esquire was appointed Trustee for the estate.

In May of 1992, the Trustee applied for an order granting him authority to employ Principal Asset Markets, Inc., f/k/a Principal Residential Advisors, Inc., as brokers for the trustee. The application for retention refers to the affidavit of the Senior Vice–President of Principal Asset Markets, Inc., Timothy Kirkpatrick, for the terms of the agreement. The last paragraph of the application provides that "the ultimate fee ... [will] be paid to the said brokers by the estate to be determined by further order of this court." The affidavit refers to the letter proposal to the Trustee dated January 20, 1992, which states that the fee was based upon "2% of the total principal balance of loans sold." In the affidavit, the Vice–President stated that he was aware that the compensation was "subject to Bankruptcy court approval." Therefore, the Order granted by this court on May 14, 1992 approved the designation and retention of the brokerage firm. The Order specifically stated that "the fee to be paid to Principal Residential Advisors, Inc. for this retainer shall be fixed by this court upon appropriate application for and on behalf of Principal Residential Advisors, Inc., with said fees not to exceed those allowed by law."

Correspondence between Allen Gorski, counsel for Trustee, and Timothy Kirkpatrick, Senior Vice–President of Principal Residential Advisors, Inc., further set out the terms and conditions for the agreement. In a letter dated June 8, 1992 to Kirkpatrick from Gorski, the former was reminded to keep accurate, detailed time records of the services rendered on behalf of the estate. On June 12, 1992, Kirkpatrick responded that Principal Residential Advisors, Inc. expected the 2% of the total unpaid principal balance upon completion of the sale. He also explained that Principal Residential Advisors, Inc. would submit the detailed time records, but the billing would not be based on an hourly rate. Gorski answered with a letter on June 22, 1992 which stated:

> Principal Financial Group was appointed by the Bankruptcy court and all fees are subject to Bankruptcy court approval. Although you indicated that it is customary to charge a fee of 2% of the total unpaid principal balance of the portfolio, I suggest that you submit to the court detailed time records to indicate to the court that you have earned your 2% commission.[1]

Principal Asset Markets, Inc. operates in marketing and the sale of consumer assets and mortgage portfolios. It does a substantial amount of work for both private institutions and government entities, including Resolution Trust Corporation. This court appointed Principal Asset Markets, Inc. to evaluate and market a distressed mortgage loan portfolio with properties in twenty states and with an outstanding balance of over $10,000,000.00.

Principal Asset Markets, Inc. began to assist the Trustee in August, 1991 before retention was approved. Time records of 190 hours were submitted to this court for the period of July 14, 1992 through December 7, 1992. The brokerage firm reviewed documents and evaluated the collateral, performed portfolio stratification, helped obtain competent appraisers, developed a

---

**1.** By a letter dated August 13, 1993, counsel asserted that the applicant was assured by the Trustee that time records were kept as a "kind of backup thing."

marketing strategy, compiled a nationwide mailing list and distributed short fact sheets to potential bidders. Additionally, it prepared confidentiality agreements and an offering statement for serious bidders, made hundreds of phone calls, facilitated on-site due diligence investigations, conferenced with potential bidders, coordinated the bidding, analyzed the sealed bids, and attended an auction sale held in the Bankruptcy Court. It found that 82% of the loans in the portfolio were more than 90 days delinquent, and some serious question arose regarding the adequacy of the collateral. Principal Asset Markets, Inc.'s efforts led to active bidding which resulted in a winning bid of $2,300,000.00. This bid appeared to be reasonably impressive, considering that before retention the highest bid was $900,000.00. Principal Asset Markets, Inc. now requests payment of a fee of $199,176.79, which is 2% of the principal loan balance of $9,958,839.48.

At the May 5, 1993 hearing, this court awarded a fee of $45,600.00, which is approximately 2% of the actual sales price. The court also pointed out that the fee of $245 an hour for each person who worked on the file, including secretaries, paralegals and routine employees, was sufficient. The requested fee, which worked out to more than $1,000 an hour per person for 190 hours of service rendered, was unconscionable and would not be allowed.

On May 5, 1993, a motion for reconsideration of the fees awarded to Principal Asset Markets, Inc. was filed. Since the applicant had not been represented by counsel at the initial hearing, the court agreed to reconsider its earlier determination. At the June 7, 1993 hearing, the court repeated its concerns about the fee request. Counsel for Principal Asset Markets, Inc. understood the court's discretion as to the final fee granted but argued that the 75% reduction in the fee, considering its contingency nature, was unfair. Counsel for Principal Asset Markets, Inc. was asked to submit a memorandum in support of its position, and same was duly filed.

## ISSUE

This court must determine whether the Bankruptcy Court has the discretion to reduce broker's fees received on a contingency basis if it finds the requested fee to be unreasonable.

## DISCUSSION

Although Trustee's counsel and applicant's senior Vice–President agreed upon a 2% commission based on the principal balance, the Order entered by the court did not explicitly approve the contingency fee, but rather merely approved retention of the applicant and reserved the commission for further consideration. The notations in the application, affidavit, and the order that the fee was subject to court approval served to notify the applicant that the court reserved the right to review a request for broker's commission and that this court would not automatically approve a commission of 2% of the principal balance upon the sale of the portfolio.

Under 11 U.S.C. § 327, the trustee, with the court's approval, may employ "professional persons" such as brokers. Under 11 U.S.C. § 328(a), this employment may be "on any reasonable terms and conditions...." As directed by 11 U.S.C. § 330(a), the court, after notice and hearing, may award "reasonable compensation" for necessary services to the estate.

The supervision of professional fees is essential to the operation of bankruptcy law, integral to the operation of the bankruptcy system and required by the Bankruptcy Code. This court believes it has a duty to evaluate the reasonableness of professional compensation and the duty cannot be delegated. *In re Kahler*, 84 B.R. 721 (Bankr.D.Colo.1988); *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 870 (Bankr. N.D.Ill.1989). The standard of review which the court will employ in determining the compensation to be paid to these professionals is, by statutory doctrine, that of reasonable compensation for work actually performed.

Although these applicable code sections apply primarily to attorneys and accoun-

tants seeking compensation through the court from debtor's estate, bankruptcy courts have consistently required supportive documents for requests for commissions by brokers and have applied the standard of "reasonable compensation" to determine the amounts to be awarded. *In re Frigitemp Corp.*, 24 B.R. 209 (S.D.N.Y. 1982).

■ Notwithstanding the terms of the contractual agreement between the debtor and a professional, the fees to be paid are implicitly subject to alteration if, after the services are rendered, the terms prove to have been inequitable. It is for this very reason that appointed professionals are required to submit detailed applications regarding the dates, precise tasks performed, and the time expended to perform those tasks, before such fees are allowed. *In re Crouse Group, Inc.*, 75 B.R. 560 (Bankr. E.D.Pa.1987).

The applicant argues that it should be awarded 2% of the unpaid principal balance because it was agreed upon, it is an industry norm, and it is reasonable. The applicant, however, has not supplied any information supporting this assertion to the court. In his certification, the applicant's President stated that in the instances where a fee is based on gross proceeds of sale, the commission ranges from 10% to 20%. He argues that given the complexity of the matter, the national marketing that was required, and the time expended, the award of 2% of the actual sales price is unreasonably low.

This court looks to case law to determine the standard for broker's fees. A number of cases base a contingency fee on the actual sales price where the percentages granted ranged from 2% to 5%. These courts all justified a reduction in the percentages because the fees sought were unreasonably high, considering the time and effort involved. *See, e.g., In re Concept Clubs*, 125 B.R. 634, 637 (Bankr.D.Utah 1991); *In re Sergio*, 39 B.R. 522, 525 (Bankr.D.Haw.1984); *In re Clapp*, 36 B.R. 768, 771 (Bankr.D.Haw.1984); *In re Vaniman Int'l*, 24 B.R. 207, 208 (E.D.N.Y.1982); *In the Matter of Womack*, 1 B.R. 95, 98 (Bankr.D.Nev.1979). In *Womack*, a broker of real property requested a fee award for 5% of the sales price. An agreement was made for payment of this percentage, without a guarantee because the bankruptcy court had reserved for the final determination. Chief Judge Lloyd D. George's standard for determining reasonableness consisted of a number of factors which included, but were not limited to: (1) the commercial reasonableness, (2) the amount to be found in the estate from which payment can be made, (3) the time and expense put in, (4) the amount brought into the estate by the sale, (5) the difficulty of finding a buyer, and (6) the amount which might be left to pay off secured and general creditors. *Id.* at 98. The court concluded that a 2% commission based on the sales price was reasonable when balancing the positive factors against the negative factors. *Id.*

In *Concept Clubs*, a broker seeking a 10% commission based on the sales price of a business property was granted a 5% commission. The court applied a "reasonable standard" to determine an appropriate fee. *Concept Clubs*, 125 B.R. at 637. Customary percentages for similar services was merely one element, among others, which the court considered in its determination of the proper rate of the broker's commission. *Id.* (citing *Vaniman*, 24 B.R. at 208). Judge John H. Allen also examined legislative history which provides that "[i]n a bankruptcy case fees are not a matter for private agreement. There is inherent a 'public interest' that 'must be considered in awarding fees....' Compensation in private employment ... is a point of reference, not a controlling determination of what shall be allowed in bankruptcy cases." H.R.Rep. No. 95–595, 95th Cong. 2d.Sess. 40 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5826 (citation omitted). The court then employed the *Womack* factors to determine reasonableness. Because most entries did not specify the time spent on the described activities, the court could not calculate the exact amount of total time spent. *Concept Clubs*, 125 B.R. at 638. Judge Allen concluded that professionals, who request reimbursement for their en-

deavors from the debtor's estate, have a responsibility and burden of providing adequate descriptions of the services provided and expenses incurred in order for the court to make a determination of the reasonableness of the fees requested. *Id.* *See also In re Malden Mills,* 42 B.R. 476 (Bankr.D.Mass.1984). The credibility of the time claimed in insufficient time records is left to the court's discretion.

This court follows a similar approach to the determination of professional fees. Section 330(a)(1) of the Bankruptcy Code enables the court to award a professional person "reasonable compensation for actual necessary services ... based on the nature, the extent and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title...."

A bankruptcy judge makes this determination with the assistance of a fee application submitted by the professional requesting payment from an estate. Federal Rule of Bankruptcy Procedure 2016(a) requires that the application must set forth a detailed statement of the following: "(1) the services rendered, time expended and expenses incurred, and (2) the amounts requested ... what payments have ... been made or promised to the applicant ..., the source of the compensation ... and the particulars of any sharing of compensation or agreement of understanding...." Fed. R.Bankr.P. 2016(a). This application is fundamental to a judge's understanding of the services rendered.

■ The procedure of awarding professional fees has been established by the Third Circuit in *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 166 (3d Cir.1973) (*Lindy I*) and *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 104 (3d Cir.1976) (*Lindy II*). The *Lindy I* and *Lindy II* analyses require the court to establish "lodestars" for professional fees by multiplying a reasonable hourly rate by the number of hours reasonably and necessarily spent performing services. To help determine the reasonable hourly rate, the court must take into account the reputation and status of the professional. *Lindy I,* 487 F.2d at 167.

■ The court cannot properly fix a professional's fee by merely multiplying the hourly rate by the number of hours. This court must consider other factors must be considered in fixing the fee. Although *Lindy I* coins reasonable compensation as the "lodestar" of the court's determination, *Lindy I* also stresses the need to consider at least two other factors. One factor is "the contingent nature of success." The court explained that it could "find that the contingency was so slight or the amount found to constitute reasonable compensation for the hours worked was so large a proportion of the total recovery that an increased allowance for the contingent nature of the fee would be minimal." *Id.* at 168.

The other factor to consider is the extent to which "the quality" of the work justifies an increase or decrease in the original "lodestar amount." The "quality" depends upon the complexity and novelty of the issues, the judge's observance of the quality of work, and the amount of recovery obtained. The increase or decrease of the "lodestar" on account of the quality of work should reflect the unusual degree of skill, albeit good or poor. *Id.*

In *Lindy II,* the Third Circuit expounded upon these two factors from *Lindy I* in order to facilitate their implementation. *Lindy II,* 540 F.2d at 116. As to "the contingent nature of success," a court should consider the following:

1. Analysis of plaintiff's burden ... (a) the complexity of the case,—legally and factually; (b) the probability of defendant's liability,—whether it is clear or dubious; whether it has been previously suggested by other civil or criminal proceedings; whether it is asserted under existing law or statutory interpretation, or is advanced as a novel theory; (c) an evaluation of damages, whether the claims would be difficult or easy to prove.

2. Risks assumed in developing the case ... (a) the number of hours of labor

risked without guarantee of renumeration; (b) the amount of out-of-pocket expenses advanced for processing motions, taking depositions, etc.; (c) the development of prior expertise in the particular type of litigation....

3. The delay in receipt of payment for services rendered.

*Id.* at 117.

As to "the quality" factor, *Lindy II* points out that courts should recognize that quality is inherent in the "lodestar" award because it is taken into consideration when determining the reasonable hourly rate. The quality of the professional's work in general should not be used to diminish or reward the "lodestar." Any increase or decrease should be carried out to take into account the unusual degree of skill. *Id.* at 117–18. To determine whether an adjustment is in order the court may consider:

> The result obtained by verdict or settlement, evaluated in terms of (a) the potential money damages available ...; (b) the benefit—monetary or non-monetary, ... i.e. permitting the court "to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested.

*Id.* at 118 (citing *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 168 (3d Cir.1975)).

## CONCLUSION

■ Based upon the factors set forth in Section 330 of the Bankruptcy Code and in *Lindy I* and *II*, this court concludes that the award of $46,000.00, or 2% of the actual sales price, is reasonable compensation in this case. First, it falls within customary parameters. Secondly, when broken down into an hourly rate it equals approximately $245 an hour for each involved employee of the brokerage firm. This court determines that a reasonable rate for many of the employees is between $100 and $200 per hour. An increase in the "lodestar" award is given with respect to both "the contingent nature of success" and "the quality." This court also recognizes the risk that the brokerage firm took in taking responsibility for the sale of the distressed mortgage portfolio. Furthermore, the court is aware that this is a highly qualified brokerage firm and incorporated this in the hourly rate given in the "lodestar" determination. The firm did exceptional work in selling the mortgages for $1.4 million which is more than the debtor might have gotten if the brokerage firm did not render services.

Taking into consideration the risk involved and the results obtained by the services rendered, an hourly rate of $245 is reasonable. This award is generous for a bankruptcy fee award considering the time entries providing for 190 hours, do not meet the standards of Fed.R.Bankr.P. 2016(a) because of vague descriptions and duplication. Therefore, the award of 2% of the actual sales price slightly more than determined by this court on May 5, 1993 is fair compensation for the services rendered.